# IN THE UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| BRIAN L. HOPKINSON, | ) | |
| | ) | |
| Movant, | ) | Case No. 12 CV 10337 |
| | ) | |
| v. | ) | Criminal Case No. 10 CR 538 |
| | ) | |
| UNITED STATES OF AMERICA, | ) | Judge Joan H. Lefkow |
| | ) | |
| Respondent. | ) | |

## OPINION AND ORDER

Brian L. Hopkinson, moves to vacate, set aside, or correct his sentence under 28 U.S.C. § 2255. He challenges the 160-month sentence that he is serving after pleading guilty to four counts of mail fraud. For the reasons stated herein, Hopkinson's petition and ancillary motions are denied.

## BACKGROUND

### I. Factual Background

Hopkinson worked as an accountant and attorney in Park Ridge, Illinois. (Gov. ver. at 1.)[1] He maintained his own law office where he also acted as an investment advisor. (*Id.*) In 1998, Hopkinson formed Dental Venture Capital Company (DVCC) (Cr. dkt. 1 at 1),[2] a private investment company that claimed to provide financing for young dentists to acquire existing dental practices from retiring dentists. (*Id.*) Hopkinson falsely represented to his investors that their capital would be used to finance the acquisitions of existing dental practices that he would

---

[1] Prior to Hopkinson's sentencing hearing the government submitted its version of the offense to the U.S. Probation Officer handling the case. Citations to that document, which does not appear on the electronic docket because it contains sensitive information, will be noted in the text as "Gov. ver."

[2] Citations to the docket in this civil case, No. 12 CV 10337, will be noted as "Dkt."; citations to the district court docket in Hopkinson's underlying criminal case, No. 10 CR 538, will be noted in the text as "Cr. dkt."

determine to be safe, making them low-risk investments yielding above-average returns. (*Id.* at 3.) He was to repay his investors with monthly returns of principal and interest over a period of four years. (*Id.*)

From its inception, Hopkinson ran DVCC as a Ponzi scheme. (*Id.* at 1–4.) For nearly nine-and-a-half years he used funds obtained from new investors to pay monthly "lulling" payments to clients in order to keep the scheme going. (*Id.* at 4.) By June 2007, however, DVCC was not bringing in enough money from new investors to sustain the monthly payments. (Dkt. 5 at 6.)[3] In July 2007, Hopkinson, aware that he could not maintain the scheme any longer, sent letters to many of his investors notifying them that DVCC had operated as a Ponzi scheme and asking their forgiveness. (*Id.*)

## II. Procedural History

In mid-July 2007, the government served a grand jury subpoena on Hopkinson calling for the production of his and DVCC's business records. (PSR at 4.)[4] At or around that time, Hopkinson retained Attorney Keri Ambrosio to represent him. (Dkt. 5 at 6–7.) Hopkinson gave the documents requested by the government to Ambrosio, who advised him that submitting the documents to the government would "prove the United States' case." (Dkt. 5 at 7.) Hopkinson, through Ambrosio, invoked his Fifth Amendment right against self-incrimination and refused to produce the documents, forcing the government to issue numerous subpoenas to Hopkinson's bank in order to reconstruct his fraud. (PSR at 4.) The government, however, was only able to

---

[3] Movant filed his memorandum in support of his motion as an attachment to his motion seeking leave to file a brief exceeding allowed page limits. That motion and accompanying memorandum are separately paginated. The page numbers referred to herein are those of the memorandum, which begins on the third page of the document on the docket.

[4] Citations to the presentence report will be noted in the text as "PSR." The PSR does not appear on the electronic docket.

obtain records from June 2002 through June 2007, roughly half the time that Hopkinson ran his Ponzi scheme. (*Id.*)

After concluding its investigation, the government provided Ambrosio with its findings as well as a draft plea agreement containing preliminary sentencing guidelines calculations and loss figures.[5] (Dkt. 14 at 5.) Disagreeing with the government's loss calculation, Hopkinson rejected the agreement and, acting on instructions from Ambrosio, prepared a reconciliation report that he claimed accurately represented the losses to his investors as less than $2.5 million. (Dkt 5 at 9.) The government, however, rejected his calculation because the report lacked sufficient detail and backup documentation. (Dkt. 14 at 5.) Shortly thereafter, the government provided a second draft plea agreement that Hopkinson also rejected, and it then filed a four-count information charging Hopkinson with fraud in violation of 18 U.S.C. § 1341. (Cr. dkt. 1.)

On January 19, 2011, Hopkinson entered a blind plea of guilty. (Cr. dkt. 22.) The same day, he filed a plea declaration, which preliminarily calculated his guidelines offense level to be 30. (Cr. dkt. 23 at 5.) His declaration acknowledged enhancements for using sophisticated means and 50 or more victims, which the government had included in its first draft plea agreement. (*Id.* at 3.) On February 1, 2011, Hopkinson filed an amended plea declaration that omitted the two-level sophisticated means enhancement, reducing the offense level to 28 and, assuming a three-level reduction for acceptance of responsibility, resulting in an anticipated sentencing range of 78 to 97 months. (Cr. dkt. 25 at 3–5.)

Following Hopkinson's guilty plea, the government submitted its version of the offense to the Probation Office on May 18, 2011. (PSR at 3.) The total loss to investors under the government's Guidelines analysis was projected at $3.6 million. (PSR at 5.) That number was

---

[5] The government had originally calculated the offense level at 38 (apparently based on a greater loss amount than it ultimately proffered), resulting, with acceptance of responsibility, in a sentencing range of 235 to 293 months. (See Dkt. 14 at 8, ¶ c.)

extrapolated from the 2002–2007 records which indicated a loss of over $2 million during that time. (Gov. ver. at 13.)

Sometime in September 2011, Hopkinson furnished documents to the Probation Office disputing the government's loss calculation. (PSR at 4.) The assigned probation officer, however, discredited Hopkinson's submissions for being unsubstantiated, inaccurate, and incomplete, and instead adopted the government's loss calculation. (*Id.* at 4–5, 22.) Citing "more than sufficient evidence that [Hopkinson] knowingly and purposefully . . . [engaged in conduct that] could be considered an attempt to obstruct justice," the officer also recommended that Hopkinson not receive the three-level acceptance of responsibility reduction. (*Id.* at 5–6, 8.) Ultimately, the probation officer calculated Hopkinson's offense level at 37 and his criminal history at level I,[6] resulting in a guidelines range of 210 to 262 months. (*Id.* at 21.) Hopkinson responded to the PSR's recommendations with a sentencing memorandum that accepted the government's loss position in an attempt to receive the three-level reduction for acceptance of responsibility. (Cr. dkt. 37 at 2–3.)

At his sentencing hearing on December 19, 2011, Hopkinson again conceded the government's loss calculations in order to avoid any suggestion that he did not deserve the three-level reduction for acceptance of responsibility. (Cr. dkt. 44 at 38:18–19; *see also* cr. dkt. 37 at 3.) The court accepted the then-undisputed loss amount, granted acceptance of responsibility, and calculated an offense level of 34, which resulted in a guidelines range of 151 to 188 months. The court sentenced Hopkinson to 160 months' incarceration followed by two years of supervised release. (Cr. dkt. 44 at 47:8–12.) Hopkinson did not appeal.

---

[6] There was, and remains, no dispute between Hopkinson and the government regarding his criminal history category.

## LEGAL STANDARD

Section 2255 allows a convicted person held in federal custody to move the sentencing court for an order vacating, setting aside, or correcting the person's sentence. 28 U.S.C. § 2255(a). "Relief under § 2255 is reserved for extraordinary situations." *Hays* v. *U.S.*, 397 F.3d 564, 566 (7th Cir. 2005) (quoting *Prewitt* v. *U.S.*, 83 F.3d 812, 816 (7th Cir. 1996)). A movant must establish "that the district court sentenced him in violation of the Constitution or laws of the United States or that the sentence was in excess of the maximum authorized by law or is otherwise subject to collateral attack." *Id.* at 566–67 (quoting *Prewitt*, 83 F.3d at 816). It is proper to deny a § 2255 motion without an evidentiary hearing if "the motion and the files and records of the case conclusively demonstrate that the prisoner is entitled to no relief." 28 U.S.C. § 2255(b).

## ANALYSIS

First, Hopkinson argues that his counsel was constitutionally ineffective during the plea and sentencing proceedings because she did not (1) produce documents in response to the grand jury subpoena, (2) retain a forensic accountant, (3) object to certain sentencing enhancements, and (4) undertake a reasonable investigation before encouraging him to plead guilty. (Dkt. 5 at 19–22.) Second, Hopkinson argues that the court used the wrong version of the sentencing guidelines at his sentencing and, therefore, he is entitled to resentencing under the holding in *Peugh* v. *U.S.*, 569 U.S. 530, 133 S. Ct. 2072, 186 L. Ed. 2d 84 (2013).

## I. Ineffective Assistance of Counsel

A movant "bears a heavy burden in making out a winning claim based on ineffective assistance of counsel." *U.S.* v. *Trevino*, 60 F.3d 333, 338 (7th Cir. 1995). To prevail, he must show (1) "that counsel's representation fell below an objective standard of reasonableness," and

(2) "that there is a reasonable probability that, but for counsel's unprofessional errors, the results of the proceeding would have been different." *Strickland* v. *Washington*, 466 U.S. 668, 688, 694, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

To satisfy the first prong of the *Strickland* test, a movant must direct the court to specific acts or omissions of his counsel. *Fountain v. U.S.,* 211 F.3d 429, 434 (7th Cir. 2000) (citing *Trevino*, 60 F.3d at 338). The court must then consider whether, in light of all of the circumstances, counsel's performance was outside the range of professionally competent assistance. *Id.* To satisfy the second prong of the *Strickland* test, the movant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different. *Id.* "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland,* 466 U.S. at 694. If Hopkinson cannot establish one of the *Strickland* prongs, the court need not consider the other. *See id*. at 697.[7]

### A. Grand Jury Subpoena

Hopkinson argues that Ambrosio's decision not to produce documents in response to the grand jury subpoena because she believed that it "would prove the United States' case" (dkt. 5 at 18–20) amounts to ineffective assistance because he had already confessed to his crimes when he wrote letters to his investors pleading for their forgiveness. (*Id.*) While it is true that Hopkinson's letters likely made his conviction a foregone conclusion, the information sought in the subpoena was not confined to the binary issue of guilt versus innocence. Rather, the subpoena sought probative information for a sentencing guidelines calculation, e.g., loss amount and number of victims. That Hopkinson confessed his crimes to his investors does not make Ambrosio's decision unreasonable. Ambrosio made a strategic choice not to comply with the subpoena and

---

[7] Ineffective assistance of counsel claims can be raised for the first time in a collateral proceeding under § 2255, regardless of whether the movant could have raised the claim on direct appeal. *See Massaro* v. *U.S.*, 538 U.S. 500, 509, 123 S. Ct. 1690, 155 L. Ed. 2d 714 (2003).

instead force the government to prove up its case regarding Hopkinson's fraud—which could have resulted in a lower sentencing guidelines calculation benefitting Hopkinson.[8] *Harding v. Sternes*, 380 F.3d 1034, 1044–45 (7th Cir. 2004) (noting that when evaluating an attorney's conduct, efforts must be "made to eliminate the distorting effects of hindsight . . . and to evaluate the conduct from counsel's perspective at the time" (quoting *Strickland*, 466 U.S. at 689)); *see also Lopez* v. *Thurmer*, 594 F.3d 584, 588 (7th Cir. 2010) ("[The court] will not pick apart counsel's strategic choice 'with the benefit of hindsight.'" (quoting *McAfee* v. *Thurmer*, 589 F.3d 353, 356 (7th Cir. 2009)). Such a strategic choice was within the "wide range of professionally competent assistance." *Id.*; *Strickland*, 466 U.S. at 690.

Accordingly, Hopkinson is not entitled to relief for this claim.

B.  **Failure to Retain a Forensic Accountant**

Hopkinson next argues that Ambrosio was ineffective because she did not retain a forensic accountant to independently review DVCC's records to verify his investors' losses. (Dkt. 5 at 22–25.) Hopkinson's asserted prejudice for this alleged failure is that, had an expert been retained to prepare an independent analysis, Ambrosio could have used it as evidence that the government overstated both the number of victims affected and the amount of loss they sustained. (*Id.* at 25.)

Hopkinson, having been an accountant for the majority of his career, was fully qualified to dispute the loss amount and number of victims. Hopkinson had access to all of the documents; he does not attempt to explain how an independent accountant would have done anything

---

[8] In his motion, Hopkinson indicates he instructed Ambrosio to respond to the subpoena in whatever matter she deemed necessary. (*See* Dkt. 5 at 18–19 (Hopkinson instructing Ambrosio to "take whatever steps she deemed appropriate to comply with the . . . subpoena").) Additionally, there is no indication that he objected to her decision not to comply or that he was unaware that the documents were being withheld.

7

differently than he himself did. Moreover, Hopkinson's argument, that the government and the probation officer rejected his reconciliation report because of his "close proximity to the facts" but may have been more willing to accept a report submitted by an independent accountant, is unsupported by the PSR. (Dkt. 5 at 24.) In fact, the probation officer did not reject his reconciliation report because of perceived bias, but rather because it was not substantiated with documentation and was, according to Hopkinson himself, based in part on his own "best recollections." (PSR at 4–5.) Hopkinson does not argue that an independent accountant's report would not have been similarly unsubstantiated. Thus, while it is conceivable that the probation officer would not have rejected a reconciliation report by an independent accountant, despite its suffering from the same weaknesses as Hopkinson's report, that is not sufficient to raise a reasonable probability that, had Ambrosio retained an independent accountant to do essentially what Hopkinson had already done, the outcome would have been different. *See Taylor* v. *Bradley*, 448 F.3d 942, 950 (7th Cir. 2006) ("Counsel's deficient performance does not prejudice the defense when his performance might possibly have had a *conceivable* effect on the outcome of the case." (emphasis added)). Therefore, Hopkinson has not satisfied *Strickland*'s prejudice prong.

### C. Failures to Object

Hopkinson argues that Ambrosio's failure to object to the government's proposed sentencing enhancements for loss amount, number of victims, and sophisticated means prejudiced him because he received a longer sentence than necessary as a result of inapplicable enhancements included in his sentencing guidelines calculation. (Dkt. 5 at 25–45.) The government responds that Ambrosio's failure to object did not prejudice Hopkinson and, moreover, it was not objectively unreasonable.

Hopkinson first contends that Ambrosio failed to object to the applicability of the government's loss calculation. (Dkt. 5 at 27, 42.) In this vein, Hopkinson's sentencing memorandum noted that the only disagreement that he had with the government related to the loss amount. (Cr. dkt. 37 at 2–3.) In that same sentencing memorandum, however, Hopkinson unequivocally accepted the government's position to avoid any suggestion that he had not accepted responsibility for his crime. (*Id.*) While Hopkinson argues that the positions in his sentencing memorandum "are not [his] words, but are rather the words Ambrosio used" (dkt. 5 at 23), he does not claim that he was unaware of the memorandum's contents, that it was submitted without his approval, or even that he expressed to Ambrosio that he disagreed with it. Moreover, during his allocution at his sentencing hearing Hopkinson stated that he "unequivocally" accepted the government's loss calculation. (Cr. dkt. 44 at 38:18–19.) Nonetheless, Hopkinson brings his ineffective assistance claim before this court to essentially retract his admissions from the record and shift the blame to his counsel for failing to object to something they had strategically chosen to accept, both in his sentencing memorandum and his allocution, to avoid jeopardizing his acceptance of responsibility reduction.

Hopkinson endeavors to substantiate his challenge to the government's loss calculation by appending a reconciliation report and including in his memo a chart of DVCC's bank records, which, as noted by the government, contain the same schedules that he submitted to probation in September 2011. (*See* dkt. 5 at 29–35; *see also* dkt. 5, Ex. B.) At that time, probation concluded that the reconciliation report was inaccurate and unsubstantiated, and refused to consider the data in determining the loss amount. (PSR at 4–5.) This was despite the probation officer's having conducted an exhaustive review of the documentation Hopkinson submitted, which is the same documentation Hopkinson relies on here. As a result, the PSR adopted the government's loss

9

calculations. (*Id.*) The court "may rely on facts presented in the PSR so long as it is well supported and appears reliable." *U.S.* v. *Panice*, 598 F.3d 426, 432 (7th Cir. 2010) (*quoting U.S.* v. *Heckel,* 570 F.3d 791, 795 (7th Cir.2009)). Hopkinson bears the burden of proving that the PSR is inaccurate or unreliable, and if there is no evidence to question the PSR's accuracy or reliability, the court may rely on it. *See id.* (holding that a "bare denial of accuracy" does not discharge this burden). Hopkinson has presented no new evidence in his motion that would bring the probation officer's judgment into dispute. As such, the court cannot find that it erred in relying on the PSR, which concluded that the government's loss calculation was more accurate than Hopkinson's competing loss calculation. Thus, Hopkinson cannot meet his burden of showing that he was prejudiced by Ambrosio's failure to object to that loss calculation because it is not reasonably probable that such an objection would have changed the outcome of his sentencing.

Hopkinson's second assertion is that Ambrosio's failure to object to the number of victims enhancement amounted to ineffective assistance of counsel. (Dkt. 5 at 38.) The court, however, sees no prejudice here. In both his original plea declaration and his amended plea declaration, Hopkinson's own calculation of his offense level acknowledged that the 4-level enhancement for 50 or more victims was applicable. (*See* Cr. dkt. 23 ¶ 8(a)(3); cr. dkt. 25 ¶ 8(a)(3).) Later in those same documents, Hopkinson acknowledged that he had reviewed each of their provisions with his attorney before signing. (*See* Cr. dkt. 23 ¶ 20; cr. dkt. 25 ¶ 20.) Moreover, Hopkinson's sentencing memorandum explicitly stated that he agreed with the number of victims enhancement. (*See* Cr. dkt. 37 at 2.) This being the case, even had Ambrosio objected to the number of victims enhancement at sentencing, there is not a reasonable likelihood

that the outcome would have been different as the court would have overruled such an objection in light of Hopkinson's own admissions in the record.[9]

Third, Hopkinson asserts that Ambrosio was ineffective for not objecting to the sophisticated means enhancement, which he argues was inapplicable. (*Id.* at 39–42.) This argument is unavailing because the enhancement did apply and, thus, Hopkinson was not prejudiced by the failure to object. The Seventh Circuit has upheld the application of the sophisticated means enhancement when "the conduct shows a greater level of planning or concealment than a typical fraud of its kind." *U.S.* v. *Green*, 648 F.3d 569, 576 (7th Cir. 2011) (quoting *U.S.* v. *Landwer,* 640 F.3d 769, 771 (7th Cir. 2011)); *see also U.S.* v. *Knox*, 624 F.3d 865, 871 (7th Cir. 2010) (noting that a sophisticated means is proper "when the offense conduct, viewed as a whole, was notably more intricate than that of the garden-variety [offense]." (alteration in original)).

Hopkinson argues that his case differs from *Landwer*, the primary case relied upon by the government, and therefore does not warrant a sophisticated means enhancement. In *Landwer*, the defendant defrauded at least seventeen "elderly or financially distressed" victims by operating a fictitious financial firm, and posing as a lawyer and CPA. 640 F.3d at 770. The defendant elicited

---

[9] Moreover, were the court to have considered the evidence Hopkinson now provides regarding the number of victims, he still would have been unsuccessful. Hopkinson includes a chart in his 2255 motion (dkt. 5 at 29–35), which he claims is an accurate list of his victims. He first argues that individual victims and entities controlled by those individuals should not be treated as separate victims. (*See* Dkt. 5 at 38.) This argument does not comport with the term "victim" as it is defined in the sentencing guidelines. *See* 2010 U.S.S.G. § 2B1.1, Application Note 1 ("'*Victim' means (A) **any** person who sustained any part of the actual loss determined under subsection (b)(1); . . . 'Person' includes individuals, corporations, companies, associations, firms, partnerships, societies, and joint stock companies.*") (italics in original, emphasis added). Additionally, Hopkinson argues that, even if individuals and the entities they controlled are considered separate victims, there are less than 49 victims, not more than 50. (*See* Dkt. 5 at 38.) After reviewing Hopkinson's chart, the court counts at least 50 victims. Thus, even disregarding Hopkinson's numerous admissions in the record as to number of victims, the court cannot find that he has presented evidence that gives rise to a reasonable probability that the outcome would have been different had Ambrosio objected to the number of victims enhancement in the PSR or at sentencing.

11

money from his victims for investments that he assured them were "safe," but instead stole his victim's investment funds. *Id.* at 771. He maintained his investors' confidence using forged documents and fictitious correspondence. *Id.* The court acknowledged that although his individual schemes may have been simple, his fraud as a whole was "significantly more elaborate." *Id.* Ultimately, the Seventh Circuit upheld the district court's application of the sophisticated means enhancement. *Id.*

Hopkinson argues that the only similarity between his case and *Landwer* is that "both assured their victims that they were investing in a low-risk investment[,]" and therefore his fraud was no more than a "garden variety" Ponzi scheme. (Dkt. 5 at 41.) Hopkinson's argument is unpersuasive. Even a cursory review of the facts in *Landwer* reveals multiple similarities with Hopkinson's case. Both defendants established fictitious investment firms that promised low-risk investments and reassured their "investors" using fraudulent documents. In Hopkinson's case, these included letters, brochures, and other marketing materials to advertise DVCC as a legitimate private investment company. He targeted family members, church members, friends, and neighbors who, because of personal relationships, had reason to trust him. He signed "promissory notes" that falsely represented to the investor the interest they were owed, the monthly payment schedule, and the total amount that was to be repaid on the investment. Additionally, like Landwer, Hopkinson misused his specialized knowledge as both an attorney and accountant to falsely represent that he accurately valued existing dental practices as sound, low-risk investments, guaranteeing a fixed 9.5% rate of return. *See U.S.* v. *Stafford*, 639 F.3d 270, 276 (6th Cir. 2011) (citing defendant's misuse of specialized knowledge in support of affirming the application of sophisticated means enhancement). Finally, the monthly payments sent to Hopkinson's victims came with a "statement" purporting to reflect outstanding payments,

which served to keep the victims' confidence in their investments and to reassure them that they would be paid accordingly. Hopkinson managed to keep this scheme concealed for nearly nine and a half years, defrauding at least fifty victims. (Cr. dkt. 1 at 2); *see U.S.* v. *Rettenberger*, 344 F.3d 702, 709 (7th Cir. 2003) (affirming a finding of sophisticated means where the appellant engaged in "[c]areful execution and coordination over an extended period." (alteration in original)). By comparison, the scheme in *Landwer* lasted for seven years and affected only seventeen people. 640 F.3d at 771. These similarities support a finding that Hopkinson used "sophisticated means" in his crime.

Because the sophisticated means enhancement was appropriately applied, Hopkinson cannot make the necessary showing that he was prejudiced by Ambrosio's failure to object to the enhancement at sentencing.

For the reasons stated above, Hopkinson's claim regarding Ambrosio's failure to object to either the PSR or at sentencing does not satisfy the prejudice prong of *Strickland*.[10]

Accordingly, Hopkinson is not entitled to relief on this claim.

### D.     Failure to Advise to the Consequences of Pleading Guilty

Hopkinson's fourth and final claim for ineffective assistance of counsel alleges that, but for Ambrosio's failure to advise him as to the consequences of pleading guilty, Hopkinson would have "forced the United States to its test of proofs . . . to the applicability of the [loss amount,

---

[10] Hopkinson's third claim also contains an assertion that Ambrosio's failure to file objections to the PSR amounted to ineffective assistance of counsel. (*Id.* at 45.) Hopkinson does not provide any new evidence to support this contention, but instead asks the court to rely on the previous exhibits and charts contained in the section of his memorandum supporting the claim that Ambrosio was ineffective during the sentencing hearing. (*Id.*) Because the court has already found that the evidence cited does not show that Hopkinson was prejudiced by Ambrosio failing to make objections at the sentencing hearing, it likewise finds that a failure to make the same objections to the PSR itself did not result in prejudice to Hopkinson.

number of victims, and sophisticated means] enhancements." (Dkt. 5 at 45–47.) This argument also fails under *Strickland*.

To support his claim, Hopkinson points to two instances where he claims Ambrosio misadvised him: (1) prior to sentencing, she advised Hopkinson that he would be looking at a sentence between six and eight years based on an estimated loss of around $1.5 million, (*id.* at 45); and (2) her statement on the day of sentencing that there was "no way" he would receive a sentence for longer than 10 years. (*Id.* at 46.) Yet, as the Seventh Circuit has held, an "inaccurate prediction of a sentence, standing alone, does not demonstrate the deficient performance component of a claim of ineffective assistance of counsel." *U.S.* v. *Barnes*, 83 F.3d 934, 940 (7th Cir. 1996).

Hopkinson additionally argues that the outcome of his plea process would have been different had Ambrosio "bothered to conduct a reasonable investigation" into the government's position regarding certain enhancements. (Dkt. 5 at 47.) Hopkinson contends that Ambrosio conducted a limited investigation as to the government's position on loss or number of victims, and, therefore, failed to fully inform him regarding the effect of those positions on his guilty plea. (*Id.* at 46.) Hopkinson, however, acknowledged the government's position throughout his plea declarations. (Cr. dkt. 23 at 3–6, 9; cr. dkt. 25 at 3–6, 9.) Those declarations further acknowledged that he carefully reviewed each provision with Ambrosio and that "no threats, promises, or representations have been made, nor agreements reached, to induce him to plead guilty." (*Id.*) The transcript from Hopkinson's plea hearing on January 19, 2011, also shows that Hopkinson was well informed prior to submitting his guilty plea. The transcript provides in pertinent part:

***

>THE COURT: Then the Court must order restitution to the victims of the offense [in] the amount that I determine at some point to be the amount due. And Mr. Hogan is saying it is in the millions of dollars, four, five million dollars.
>
>MS. AMBROSIO: Your Honor, we are agreeing to disagree on that point or we are disagreeing on that point rather.
>
>THE COURT: All right.
>
>MS. AMBROSIO: Our position is lower as stated in the guidelines calculation.
>
>THE COURT: All right. It is important that you know, Mr. Hopkinson, that in the end I'll be the one who decides how much it is, and I could agree with the government on this, and it could be more than you think based on your conversations with your attorney. Do you understand that?
>
>THE DEFENDANT: I do understand, your Honor.

(Cr. dkt. 45 at 10:4–18.)

***

>THE COURT: . . . the Court is not required to sentence within the guideline range but only to consider that range in making its decision. Do you understand?
>
>THE DEFENDANT: I do understand.
>
>THE COURT: For these reasons the sentence imposed may be different from the estimate that is contained in your plea declaration or any estimate your attorney may have given you. And it may be different from what the government has estimated as well. Do you understand that?
>
>THE DEFENDANT: I do understand that, your Honor.

(*Id.* at 12:9–20.)

***

>THE COURT: Well, Mr. Hopkinson, it seems to me based on what's being said here that it is fairly open what your guidelines sentencing range is going to turn out to be. And you understand going in that it could be

15

> quite different from what your attorney has told you and even quite different from what you heard from the government.
>
> THE DEFENDANT: I do understand that, your honor.
>
> THE COURT: And you understand that the—well, let's see. You understand that if I make a guidelines calculation that results in a higher sentencing range or if I—than you expect or if I sentence you outside the guidelines range, do you understand that you will not be allowed to withdraw your guilty plea, even though it may—the sentence may be more severe than you expect today?
>
> THE DEFENDANT: I do understand that, your Honor.

(*Id.* at 14:4–19.)

Because he has not met his burden of showing a lack of knowledge or understanding sufficient to call into question his guilty plea, Hopkinson's fourth and final claim of ineffective assistance of counsel does not satisfy either prong of the *Strickland* test.

## II. Retroactive Application of *Peugh* v. *United States*

In Hopkinson's amendment to his § 2255 motion he claims that his sentence was imposed in violation of the ex post facto clause of the United States Constitution. (Dkt. 35.) The clause provides that "no state shall . . . pass any . . . ex post facto law." U.S. Const. Art. 1, § 9, cl. 3. In a criminal context, this clause has been interpreted to prohibit the application of "any new punishment regime" in a statute "to a crime already consummated." *Lindsay* v. *Washington*, 301 U.S. 397, 401 (1937). Hopkinson argues that he was incorrectly sentenced under the 2010 Guidelines, which applied certain enhancements he believes were not included under the 2006 Guidelines, resulting in an increased sentencing range. (*Id.*)

The Seventh Circuit, however, has held that *Peugh* does not apply retroactively in cases where the guidelines range increased, but the sentence imposed was still within the statutory maximum in place at the time the crime was committed, as is the case here. *See Conrad* v. *U.S.*,

16

815 F.3d 324, 327–28 (7th Cir. 2016); *see also Burnley* v. *U.S.*, No. 06-cr-141-bbc, slip op., 2016 WL 3283563, *7–8 (W.D. Wisc. June 14, 2016). The precedent established by *Conrad* binds this court. Therefore, Hopkinson is not entitled to resentencing under *Peugh*.

## III.   Certificate of Appealability

Under 28 U.S.C. § 2253(c)(1)(B), Hopkinson may appeal from this final order denying relief under § 2255 only if the court issues a certificate of appealability. A certificate of appealability may issue if the movant has made a substantial showing of denial of a constitutional right. *Id.* § 2253(c)(2). "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack* v. *McDaniel*, 529 U.S. 473, 484, 120 S. Ct. 1595, 146 L. Ed. 2d 542 (2000). For the reasons stated above, the court finds that Hopkinson has not made a showing of a substantial constitutional question for appeal, as reasonable jurists would not find this court's ruling debatable. *See Lavin* v. *Rednour*, 641 F.3d 830, 832 (7th Cir. 2011) ("To receive certification under § 2253(c), the prisoner must show that reasonable jurists would find the district court's assessment of the constitutional claim and any antecedent procedural rulings debatable or wrong." (citing *Slack*, 529 U.S. at 484–85 and *Davis* v. *Borgen*, 349 F.3d 1027, 1029 (7th Cir. 2003))).

**CONCLUSION AND ORDER**

For the reasons discussed above, Hopkinson's § 2255 motion is denied. Because the court finds that it is clear from the record that Hopkinson is not entitled to relief, his requests for an evidentiary hearing, limited discovery, and appointment of counsel are also denied.

Date: November 29, 2017

_____
U.S. District Judge Joan H. Lefkow